UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

FRANK C. MESSINA, in his capacity as : 
Trustee of the Owen B. Gilman Irrevocable :
Life Insurance Trust dated March 15, 1994 :
 :
v. : C.A. No. 18-00065-WES
 :
THE LINCOLN NATIONAL LIFE :
INSURANCE COMPANY :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

Pending before me for a report and recommendation (28 U.S.C. § 636(b)(1)(B)) are the parties' Cross-motions for Summary Judgment. (ECF Doc. Nos. 15 and 17). For the following reasons, I recommend that Plaintiff's Motion (ECF No. 17) be GRANTED in part as to Counts I and V and Defendant's Motion (ECF No. 15) be GRANTED in part as to Counts II, III and IV.

**I.  Background**

Plaintiff Frank C. Messina, C.P.A., is the Trustee of the Irrevocable Life Insurance Trust Agreement of Dr. Owen B. Gilman dated March 15, 1994. The Gilman Trust is the Owner and Beneficiary of the Flexible Adjustable Life Insurance Policy Number 2118069 issued by Defendant Lincoln National Life Insurance Company's predecessor-in-interest, Chubb Life Insurance Co. of America. The Policy is a policy of universal life insurance which provides both life insurance and a savings element. (ECF Doc. No. 16 at ¶¶ 9-11). It allows the policyholder to use accumulated savings or value, if sufficient, to pay premiums. Id.

Dr. Gilman passed away on October 16, 2015 at the age of seventy-seven. Dr. Gilman's widow, Mrs. Katherine E. Gilman, is the sole beneficiary of the Trust that owns the Policy.

Plaintiff, as Trustee, has made a claim against Defendant for payment of the Death Benefit Proceeds under the Policy. Defendant has denied the claim and contends that the Policy terminated without value on October 8, 2015, prior to Dr. Gilman's death, due to nonpayment of a premium due on August 1, 2015. (See ECF Doc. Nos. 16-12, 16-13 and 16-14).

**II.     Facts**

The following undisputed facts are gleaned from the parties' Local Rule CV 56(a) Statements. (ECF Doc. Nos. 16, 19, 20 and 22).

1. Plaintiff and Dr. Owen B. Gilman applied for a policy of life insurance from Chubb Life Insurance Company ("Chubb") on or about March 21, 1994.

2. According to the Application, Dr. Gilman was to be the insured, and the Owen B. Gilman Irrevocable Life Insurance Trust dated March 15, 1994 (the "Trust"), was to be the owner of the Policy.

3. At all relevant times, Plaintiff was the sole Trustee of the Trust and a Fiduciary to the Trust's beneficiaries.

4. The Application, signed by both Plaintiff and Dr. Gilman, identifies Dr. Gilman's "Home Address" as "88 Cooper Road, Warwick, RI 02886."

5. The Application also includes a business address for Dr. Gilman's employer, Medical and Renal Associates. As to billing, the Application under mailing address provides "to Trustee see 5. above." Item 5 identifies the Proposed Owner as Plaintiff in his capacity as Trustee. Although requested, no address is provided for Plaintiff.

6. By signing the Application, both applicants certified under penalties of perjury:

> I HAVE READ, or have had read to me, the complete application. All statements and answers in this application are full, complete and true to the best of my knowledge and belief. I UNDERSTAND that

any false statements or misrepresentations may result in the loss of coverage under the policy.

7. Jefferson Pilot Financial ("Jefferson Pilot") acquired Chubb in 1997, and Lincoln acquired Jefferson Pilot's life insurance business in 2006.

8. Chubb, Lincoln's predecessor-in-interest, accepted the Application and issued Flexible Premium Adjustable Life Insurance Policy Number 2118069 (the "Policy") on June 6, 1994.

9. The Policy is a policy of universal life insurance, which is a kind of hybrid between term and whole life insurance.

10. Universal life insurance offers the flexibility of low-cost protection, like term life insurance, as well as a savings element, like whole life.

11. Universal life insurance typically provides that the death benefit, savings component and premiums can be reviewed and altered as a policyholder's circumstances change. For example, universal life insurance allows the policyholder to use the accumulated savings to pay premiums. Depending upon the policy's accumulated value, the policyholder may use that value to skip one or more premium payments, or the policyholder may opt to make direct premium payments instead and leave the savings component to potentially grow over time. As long as the minimum cost of the insurance is covered, either through paid premiums or accumulated value, the insurance will stay in effect. However, if the minimum cost of the insurance is not paid, either through premiums or accumulated value, the insurance will lapse.

12. In relevant part, the Policy states as to termination for nonpayment:

> **Grace Period** – During the first three policy years and subject to the Minimum Premiums Provision, the policy enters the Grace Period if the cumulative premiums paid less any partial Withdrawals and policy debt on a monthly anniversary day is not sufficient to cover the Minimum Premium requirements for the month following such

monthly anniversary day. A grace period of 61 days shall be allowed for the payment of a premium sufficient to cover the Minimum Premium requirements.

For the fourth policy year and thereafter, the policy enters the Grace Period if the Accumulated Value less any debt on a monthly anniversary day is not enough to cover the monthly deduction for the month following such monthly anniversary day. A grace period of 61 days shall be allowed for the payment of a premium sufficient to cover the monthly deduction. The monthly deduction is defined in the Policy Values section.

If the premium is not paid within the Grace Period, this policy will terminate without value. This policy will not terminate until 31 days after a notice of such premium is mailed to the last known address of the Owner.

If the Insured dies during the Grace Period, the Company will deduct any overdue premium which is applicable to the Grace Period from the proceeds of the policy.

**Policy Lapse** – If the premium is not paid within the Grace Period, this policy will lapse or terminate without value. However coverage will not end until 31 days after we have mailed a premium notice to you, and any assignee of record, at the last known address.

13. In the event of a lapse, the Policy also provides for reinstatement as follows:

**Reinstatement –** Reinstatement is the restoration of the policy after it has lapsed so following reinstatement the policy will have been put back inforce [sic] as if it had never lapsed.

If this policy lapses or terminates as provided in the Grace Period subsection, we will reinstate the policy if we receive: (1) Your written request for reinstatement within five years after the end of the Grace Period and before the Maturity Date; (2) satisfactory proof the Insured is living and insurable at the original rating class; (3) payment of all cumulative Minimum Premiums required to date if the policy entered the Grace Period within the first three policy years or a payment of a premium sufficient to keep the policy inforce [sic] for two months if the policy entered the Grace Period in policy year four or later; and (4) payment or reinstatement of any debt against the policy which existed on the date of termination.

The effective date of a reinstated policy or reinstatement date is the date we approve the application for reinstatement. The

> Accumulated Value of the policy on the reinstatement date shall be the Accumulated Value on the date of termination plus the premium received to reinstate the policy. Any surrender charges in effect on reinstatement shall be as defined in the Cash Value subsection of the Policy Values section based on the original policy date and duration.

14. Following Chubb's issuance of the Policy, Dr. Gilman and his wife made initial premium payments on the Policy by personal checks of $6,000 on June 3, 1994; $24,000 on November 15, 1994; and $21,218 on January 18, 1995.

15. Each of these checks bear the Gilman's "88 Cooper Road" address but no separate address for the Trust.

16. On April 13, 1995, Chubb mailed the Trust an annual premium notice at the "88 Cooper Road" address.

17. In addition to requesting the planned annual premium of $6,000, which was due May 1, 1995, the April 13, 1995 notice explicitly asks the recipient to "SEND NAME & ADDRESS CHANGES AND ALL OTHER CORRESPONDENCE" to a specific Chubb address.

18. The April 13, 1995 notice goes on to say, under a heading that says, "PLEASE READ:"

> If your coverage is a universal life plan, we are simply reminding you of your current planned premium. Universal life premium payments may be paid in any amount or at any time (subject to certain policy limitations). However, variations from your planned payments may affect this coverage. Therefore, a periodic review of the planned premium amount with your Chubb Life America representative, should assure the premiums are sufficient to keep this coverage inforce [sic] and attain your financial goals.

19. In discovery, Plaintiff admitted receiving the April 13, 1995 premium notice from the Gilmans in 1995. At that time, the Gilmans also gave Plaintiff a $6,000 check to pay the premium, which Plaintiff admits endorsing and sending to Chubb.

20. Chubb received the 1995 payment, but it did not receive any notification that correspondence to the Trust should be mailed to any address other than "88 Cooper Road."

21. Plaintiff admits he also received the April 13, 1996 premium notice, the following year, along with another $6,000 check, from the Gilmans.

22. The 1996 premium notice, like the prior year's, was addressed to the Trust at "88 Cooper Road," and explicitly asked the recipient to "SEND NAME & ADDRESS CHANGES…"

23. Like the prior year's notice, the 1996 premium notice also contained language advising that "premium payments may be paid in any amount or at any time," but "variations from your planned payments may affect this coverage."

24. Plaintiff admits endorsing the check, sending it to Chubb, and then hand-writing "PD 5/12/96 ck #3404" on his copy of the 1996 notice at or near the time he sent the check.

25. Chubb received the 1996 payment, but it did not receive any notification that correspondence to the Trust should be mailed to any address other than "88 Cooper Road."

26. For the next decade, this pattern repeated every year. Through 2006, Plaintiff admits receiving annual premium notices from the Gilmans each year along with personal checks for the annual premium payments.

27. Each of these annual premium notices from 1997 through 2006 was addressed to the Trust as "88 Cooper Road."

28. Each of these annual premium notices specifically requested updated address information and said where change of address information should be sent.

29. Each year, the premium notices also warned that coverage would be affected if the planned premium was not paid.

30. As to how non-payment might affect coverage, Plaintiff also admits receiving from the Gilmans at least one of the annual policy statements that the insurers mailed each year.

31. The May 3, 2005 annual statement which Plaintiff admits receiving, like the premium notices, is addressed to the Trust at "88 Cooper Road."

32. Importantly, this statement contained Policy expiration information. It said that if the annual premiums continue to be paid as planned, the Policy would remain in force through "December 2021," but if no further premiums were paid, the Policy was projected to expire in "May 2015."

33. Upon his receipt of such materials each year, Plaintiff admits that he endorsed the personal checks – which the Gilmans made payable to him – and sent the checks to the insurer to pay the annual premium.

34. In many of those years, upon sending the annual premium checks, Plaintiff made handwritten notations on his copies of the annual premium notices indicating that he had sent that year's check. The notices were addressed to the Trust at "88 Cooper Road" and they asked for updated address information. Over the years, Plaintiff never requested that future notices be sent to any other address.

36. Chubb, and later its successors, received the annual premium payments through 2006, but never received any change of address notice.

37. In response to the April 12, 2006 premium notice received by Plaintiff from the Gilmans, he endorsed a $6,000 check the Gilmans gave him, and sent it to Jefferson Pilot, then the insurer.

38. The 2006 premium notice, like those issued in prior years, was addressed and mailed to the Trust at "88 Cooper Road." It asked the recipient to "SEND NAME & ADDRESS

CHANGES" to the insurer; and it warned that "variations from your planned payments" would affect coverage.

39. Jefferson Pilot received the $6,000 payment on or about May 23, 2006. This was the last premium payment made on the Policy.

40. In response to the 2006 premium notice, neither Jefferson Pilot nor, subsequently Lincoln, ever received any change of address notification for the Trust.

41. From 2007 through 2014, inclusive, after Lincoln purchased Jefferson Pilot, Lincoln mailed two annual premium notices each year – an initial notice and a reminder – to the Trust at "88 Cooper Road."

42. Each of these premium notices mailed from 2007 through 2014, like those mailed in prior years, expressly requested updated address information and advised as to where to send any change of address notice.

43. From 2007 through 2014, inclusive, Lincoln also mailed annual policy statements to the Trust at "88 Cooper Road," and these notices contained updated expiration projections based on current rates and other assumptions.

44. The annual statements mailed in 2007 and 2008 project that if no further premiums payments are made, the Policy will expire by "July 2016."

45. The annual policy statements mailed in 2009 and 2010 project that the Policy will expire by "August 2016" if no further annual premiums are paid. The annual policy statements mailed in 2011 through 2015 project that the Policy will expire by "August 2015" if no further annual premiums are paid.

46. In response to the 2007 through 2014 annual premium notices and annual statements, the Trust did not pay annual premiums, apparently relying on the Policy's accumulated value to cover the cost of the insurance.

47. From 2007 through 2014, no one advised Lincoln of any change of address.

48. On April 11, 2015, Lincoln mailed an annual premium notice to the Trust at "88 Cooper Road," the only address Lincoln had on record.

49. The April 11, 2015 notice said that the annual planned premium of $6,000 was due on May 1, 2015.

50. Like all previous notices, the April 11, 2015 notice also asked the Trust to "SEND NAME & ADDRESS CHANGES."

51. Lincoln received no response to the April 11, 2015 notice.

52. On May 2, 2015, Lincoln mailed an annual statement to the Trust at "88 Cooper Road."

53. The May 2, 2015 annual statement showed that the accumulated value of the Policy, as of April 30, 2015 was $4,903.40. According to the statement, the cost of insurance for the previous year, ending April 30, 2015 was $16,206.00. The statement projected that if the $6,000 planned premium was paid, the Policy would remain in force only until "December 2015." However, with no further premium payments, the statement – like all of the annual statements issued since 2009 – said the Policy would expire in "August 2015."

54. When no payment was received, Lincoln followed-up by mailing a reminder premium notice on May 16, 2015. Like all prior premium notices, it also asked the Trust to "SEND NAME & ADDRESS CHANGES."

55. Having received no premium payment, Lincoln mailed a letter on August 4, 2015 warning that the Policy "does not have enough value to cover the monthly expense due on August 1, 2015."

56. The August 4, 2015 letter continued, "We are concerned that your policy will lapse without value on October 8, 2015 unless the required payment is made." "Should this policy lapse, you will lose the financial security and protection this insurance coverage provides you."

57. Lincoln received no response to the August 4, 2015 letter, and it mailed a second lapse-warning letter to the Trust on September 3, 2015.

58. Plaintiff acknowledges receiving the September 3, 2015 letter.

59. The September 3, 2015 letter again said the Policy "does not have enough value to cover the monthly expense due on August 1, 2015," and "will lapse without value on October 8, 2015 unless the required payment is made." The letter once again reiterated, "Should this policy lapse, you will lose the financial security and protection this insurance coverage provides you.

60. In response to these notices and warnings, neither the Plaintiff nor anyone else paid the annual premium or advised Lincoln of any change of address.

61. Thus, pursuant to its terms, and the multiple warnings it provided, Lincoln took the position that the Policy lapsed on October 8, 2015.

62. On October 9, 2015, Lincoln mailed a letter to the Trust at "88 Cooper Road" which said:

> The payment due on 08/01/2015 to keep your Life Insurance policy active has not been received. As the grace period has expired, your policy coverage with Lincoln National Life Insurance Company "Lincoln" is no longer in force.

63. The October 9, 2015 letter continued,

> You have the right to apply for reinstatement. We encourage you to consider reinstatement by completing the enclosed application and paying the amount due of $13,519.08. If your reinstatement application is received by 10/30/2015 and approved, your policy will be reinstated.

64. The application form, sent with the October 9, 2015 letter contained, <u>inter alia</u>, a short questionnaire about the insured's current medical status, whether he had been treated or diagnosed with certain diseases, and whether he had been hospitalized in the past five years. Such questions were necessary because the Policy expressly conditions reinstatement on "satisfactory proof the Insured is living and insurable at the original rating class."

65. The application form also required the insured's signature to authorize Lincoln to obtain his medical records and to certify that all answers given in the questionnaire were correct, complete and true.

66. On October 16, 2015, Dr. Gilman died.

67. On October 27, 2015, Mrs. Gilman sent Lincoln a check for $13,519.08 along with a handwritten note asking for the Policy to be reinstated.

68. Upon sending the $13,519.08 check, Mrs. Gilman did not send a complete reinstatement application form as required, and she did not advise Lincoln that Dr. Gilman was already dead.

69. Nor does Mrs. Gilman's October 27, 2015 note indicate that there is anything wrong with Lincoln's use of the "88 Cooper Road" address.

70. On October 30, 2015 Lincoln responded with a letter explaining that it was "unable to apply" the payment to the Policy because the Policy had lapsed.

71. Being as yet unaware of the insured's death, however, Lincoln again encouraged the Policy owner to complete and submit the application for reinstatement, another copy of which it enclosed with the letter.

72. Lincoln's October 30, 2015 letter also said that the money Mrs. Gilman sent "will be refunded to the check issuer."

73. Lincoln issued a refund check on December 1, 2015, but Mrs. Gilman never deposited it. The check memo indicated "insufficient amount."

74. Plaintiff first gave, and Lincoln first received, notice of Dr. Gilman's death on December 3, 2015 through Lincoln's internet website.

75. Lincoln responded with an email on December 4, 2015 advising that no claim would be initiated because the Policy was no longer in force.

76. Thereafter, on December 28, 2015 Plaintiff submitted claim forms seeking benefits under the lapsed Policy. In these forms, Plaintiff told Lincoln for the first time that the Trust's purported address is "1615 Pontiac Avenue, Cranston, RI 02920."

77. Having already advised Plaintiff that the Policy had lapsed and that therefore no claim would be initiated, Lincoln did not pay the claim.

### III. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure directs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his [or her] favor. Id. However, the non-moving party "must point to 'competent evidence' and 'specific facts' to stave off summary judgment."

Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)). A summary judgment motion cannot be defeated by "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010).

When evaluating "cross-motions for summary judgment, the standard does not change; [courts] view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Trust Fund ex rel. Bolton, 736 F.3d 33, 36 (1st Cir. 2013) (quoting Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013)).

### IV. Analysis

#### A. Applicable Law

Because this case is before this federal court by virtue of diversity jurisdiction, Rhode Island state substantive law applies because Lincoln's predecessor issued the Policy in Rhode Island to the Gilman Trust. Rosciti v. Ins. Co. of Penn., 659 F.3d 92, 96 (1st Cir. 2011).

Under Rhode Island law, "when the terms of an insurance policy are found to be clear and unambiguous, judicial construction is at an end. The contract terms must be applied as written and the parties bound by them." Amica Mut. Ins. Co. v. Streicker, 583 A.2d 550 551 (R.I. 1990). In determining whether contract language is clear and unambiguous, a court should interpret "the parties' intent based solely on the written words," and give unambiguous words their "plain and natural meaning." In Re Newport Plaza Assocs., 985 F.2d 640, 645 (1st Cir. 1993) (applying Rhode Island law). Contract language is ambiguous where it is "reasonably susceptible of different constructions." Westinghouse Broad Co., Inc. v. Dial Media, Inc., 122 R.I. 571, 410 A.2d 986, 991 (1980). "[W]hen an insurance contract is ambiguous or subject to more than one reasonable

interpretation, it will be strictly construed against the insurer." <u>Sentry Ins. Co. v. Grenga</u>, 556 A.2d 998, 999 (R.I. 1989); <u>see also</u> <u>Peloquin v. Haven Health Ctr. of Greenville, LLC</u>, 61 A.3d 419, 431-432 (R.I. 2013).

### B. The Grace Period / Policy Lapse

The parties present competing arguments regarding the legal relevancy of the "missing" address[1] for the Trust/Owner of the Policy, Dr. Gilman's failing health and incapacity in the months preceding his death and Mrs. Gilman's attempted payment of the past-due premium after Dr. Gilman's death. However, this dispute should and can be resolved by simply interpreting the relevant Policy language, <u>i.e.</u>, what the parties agreed to.

As previously noted, the interpretation of the Policy is a question of law for the Court. The Court must review the relevant policy language and, if it is clear and unambiguous, apply it to the undisputed facts as written. If there is an ambiguity and the policy is susceptible to more than one reasonable interpretation, it must be construed in favor of the insured. Here, I find that the Grace Period/Policy Lapse provisions are subject to more than one reasonable interpretation, and can reasonably be interpreted to conclude as a matter of law that Dr. Gilman died before the policy lapsed. Thus, I recommend that Plaintiff be GRANTED summary judgment on Count I (breach of contract) and Count V (declaratory relief), and awarded the Death Benefit Proceeds due and owing under the Policy less any overdue premium owed. Also, I recommend that Defendant be GRANTED summary judgment on Plaintiff's extra contractual bad faith claims (Counts II, III and IV) because the Policy language in issue could reasonably be read to support Defendant's claim

---

[1] It is undisputed that all relevant notices regarding the Policy and addressed to the "Policyowner" were sent to the insured's (Dr. Gilman) home address (88 Cooper Road, Warwick) and not to Plaintiff, the Policyowner. It is also undisputed that Plaintiff's address was not provided to the insurer on the initial application form or at any time thereafter. The parties dispute their respective fault for this oversight and their respective duties to inquire and/or to remedy it.

determination that Dr. Gilman died outside the Grace Period and after the Policy lapsed. My reasoning for these recommendations follows:

As to the Grace Period, the Policy provides that it "enters the Grace Period if the Accumulated Value[2]…on a monthly anniversary date is not enough to cover the monthly deduction for the month following such monthly anniversary day. A grace period of 61 days shall be allowed for the payment of a premium sufficient to cover the monthly deduction." (ECF No. 16-5 at p. 10). "If the premium is not paid within the Grace Period, th[e] policy will terminate without value…[but] will not terminate until 31 days after a notice of such premium is mailed to the last known address of the Owner." Id.

Lincoln contends that the Policy entered the Grace Period on August 1, 2015 because on that "monthly anniversary day" the Policy did not have enough value "to cover the monthly deduction for the month following such monthly anniversary day." It posits that the "Policy enters the Grace Period on the monthly anniversary day when the accumulated value is not sufficient to cover the cost of that month's coverage." (ECF No. 15-1 at p. 19) (emphasis added). Lincoln's August 4, 2015 letter to the "Policy Owner" does not use the term "Grace Period" but advises that "[c]urrently, your Life Insurance policy does not have enough value to cover the monthly expense due on August 1, 2015" and may "lapse without value on October 8, 2015 unless the required payment [of $13,511.25] is made." (ECF No. 16-12 at p. 2).

Although Lincoln's proffered interpretation is reasonable, it fails to give sufficient meaning to the "month following" language in the Grace Period provision. The Policy speaks in terms of value sufficient to cover the "monthly deduction for the month following such monthly anniversary

---

[2] This is a Universal Life policy and the policyholder may utilize accumulated policy value or savings, if sufficient, to pay premiums. The Policy defines Accumulated Value (sometimes called cash value) as being equal to net premiums paid plus accrued interest less any monthly deductions or cash value withdrawals. (ECF No. 16-5 at p. 7).

day." If the monthly anniversary day in question is August 1, it is unclear if the "month following" is August or September.

Plaintiff seizes on the "month following" language and argues that the Policy did not enter the Grace Period until the "month following" the monthly anniversary day on which the Accumulated Value was deficient, i.e., September 1, 2015. Also, the sixty-one day Grace Period is "allowed" for payment sufficient to cover such "monthly deduction." (ECF No. 16-5 at p. 10). In other words, the policyholder has sixty-one days to cure by making a payment to satisfy the delinquent "monthly deduction." Giving meaning to the "month following" language reasonably triggers the Grace Period here on September 1, 2015 as argued by Plaintiff. Thus, he convincingly argues that Dr. Gilman's October 16, 2015 death occurred during the Grace Period and before the Policy lapse. According to the Policy, if an insured dies during the Grace Period, Lincoln simply deducts any overdue premium from the Death Benefit Proceeds payable.

Plaintiff alternatively argues that Lincoln failed to satisfy an additional notice condition precedent to policy termination. The Policy Lapse provision provides as follows:

> If the Premium is not paid within the Grace Period, this policy will lapse or terminate without value. However coverage will not end until 31 days after we have mailed a premium notice to you, and any assignee of record, at the last known address.

(ECF No. 16-5 at p. 10).[3]

Plaintiff first contends that Lincoln failed to forward a "premium notice" after August 1, 2015 and thus "coverage" never terminated. Plaintiff next argues that, even if Lincoln's letters could be construed as "premium notices," the last letter was dated October 9, 2015 and therefore,

---

[3] To add to the confusion, similar, but not identical, language is contained in the Grace Period section. It provides: "If the premium is not paid within the Grace Period, this policy will terminate without value. This policy will not terminate until 31 days after a notice of such premium is mailed to the last known address of the Owner." (ECF No. 16-5 at p. 10). It is unclear why there is a duplication and if there is any relevant distinction between a "premium notice" and "notice of such premium," or between policy "lapse," "termination," and the end of "coverage."

"coverage" did not expire until November 9, 2015 – after Dr. Gilman's death. Lincoln, of course, takes a different read and contends that the letters, including the one dated August 4, 2015, were "premium notices" and more than provided the requisite thirty-one days' notice.

Again, this confusing policy language could reasonably be read to support both positions, and thus must be interpreted in favor of the insured. Plaintiff persuasively argues that the Policy language can reasonably be interpreted to provide that two notices must be sent in connection with a Policy entering the Grace Period and in danger of lapsing or terminating. As noted previously (see fn.3, supra), the Grace Period and Policy Lapse sections each have independent notice language. Although similar, these provisions use differing language which suggests distinct, separate notices. If these sections intended to reference a single notice, it would make no sense to define the notice in two different ways in two different sections of the Policy. In addition, because of the potentially serious consequences of allowing a lapse in life insurance, it is reasonable to interpret the plain language of the Policy as providing for a second post-Grace Period notice before "coverage" ends. Thus, even if Dr. Gilman died after the end of the Grace Period, the Policy can also reasonably read to conclude that he died during the thirty-one day period described in the Policy Lapse section of the Policy. Either way, Plaintiff, as a matter of law, is contractually entitled to a payout of the Death Benefit Proceeds as calculated by the terms of the Policy (less overdue premium) for the benefit of the Trust's sole beneficiary, Mrs. Gilman.

**Conclusion**

For the foregoing reasons, I recommend that the Court GRANT summary judgment to Plaintiff on Counts I and V and to Defendant on Counts II, III and IV. I also recommend that the Court enter Final Judgment in favor of Plaintiff declaring that coverage under the Policy was in

effect on the date of Dr. Gilman's death and awarding payment of the Death Benefit Proceeds under the Policy (less overdue premium) to Plaintiff for the benefit of Mrs. Gilman.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
September 9, 2019